**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1843
_____

LISA M. LUPYAN,

Appellant

v.

CORINTHIAN COLLEGES INC., successor in interest to
MJB Acquisition Corp.,trading and doing business as
WYOTECH; JAMES THOMAS;
ARTHUR HERMAN; MARK REYNOLDS
_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(W. D. Pa. No. 2-09-cv-01403)
District Judge:  Honorable David Stewart Cercone
_____

Argued:  December 17, 2013

Before:  MCKEE, <u>Chief Judge</u>
and FUENTES, <u>Circuit Judge</u>, SCHILLER*, <u>District Judge</u>

(Opinion filed: August 5, 2014)

*The Honorable Berle Schiller, United States District Court
for the Eastern District of Pennsylvania, sitting by
designation.

Adam R. Gorzelsky, Esq. (Argued)
Susan N. Williams, Esq.
Williams Law Offices
101 North Main St. Suite 102
Greensburg PA 15601

      Counsel for Appellant

Jeffrey B. Balicki, Esq. (Argued)
Feldstein Grinberg Lang & McKee, P.C.
428 Boulevard of the Allies
Pittsburgh, PA 15219

      Counsel for Appellees

_____

OPINION  OF  THE  COURT
_____

McKEE, Chief Judge

Lisa Lupyan appeals the summary judgment rendered in favor of her former employer, Corinthian Colleges, Inc. ("CCI") on her claims of interference with the exercise of her rights under the Family and Medical Leave Act ("FMLA," or "Act"), 29 U.S.C. § 2601, _et seq_; and retaliation for her exercise of those rights. After a thorough review of the record, we conclude that genuine issues of fact remain as to her FMLA claims. Accordingly, we will reverse the District Court's grant of summary judgment and remand for further proceedings.

## I. Factual & Procedural History

Lupyan was hired as an instructor in CCI's Applied Science Management program in 2004. In December 2007, Lupyan's supervisor, James Thomas, noticed that she seemed depressed and suggested she take a personal leave of absence. Appx. I at 25. On her Request for Leave Form, Lupyan specified that she was taking "personal leave" from December 4, 2007 through December 31, 2007. Appx. I at 26. However, Thomas suggested that she apply for short-term disability coverage instead. Appx. II at 10.

Accordingly, Lupyan scheduled an appointment with her doctor and received a "Certification of Health Provider," a standard Department of Labor ("DOL") form for providing certification of a mental health condition. Based on this document, CCI's human resources department determined that Lupyan was eligible for leave under the FMLA, rather than personal leave.

On December 19, 2007, Sherri Hixson, CCI's Supervisor of Administration, met with Lupyan and instructed her to initial the box marked "Family Medical Leave" on her Request for Leave Form. Hixson also changed Lupyan's projected date of return to April 1, 2008, based upon the Certification of Health Provider provided by Lupyan. Appx. I at 26. Lupyan contends—and CCI does not dispute —that her rights under the FMLA were never discussed during this meeting. However, later that afternoon CCI allegedly mailed Lupyan a letter advising her that her leave was designated as FMLA leave, and further explaining her rights under that Act (the "Letter"). Lupyan denies ever having received the Letter, and denies having any knowledge that she was on FMLA leave until she attempted to return to work. The issue of whether Lupyan received the Letter is central to this appeal.

On March 13, 2008, Lupyan advised CCI that she had been released by her doctor to return to her teaching position with certain restrictions. On April 1, 2008, Thomas informed Lupyan that she could not come back to work if any restrictions were a condition of her return. Appx. I at 27. Shortly thereafter, Lupyan provided Thomas with a full release from her psychiatrist. This confirmed that she was able to return to work without any restrictions or accommodations. Nonetheless, Lupyan was advised on April 9, 2008 that she was being terminated from her position at CCI due to low student enrollment, and because she had not returned to work within the twelve weeks allotted for FMLA leave. *Id.* at 27. Lupyan claims this was the first time she had any knowledge that she was on FMLA leave. Appx. II at 9.

Thereafter, Lupyan brought the instant action. She alleges that that CCI interfered with her rights under the

3

FMLA by failing to give notice that her leave fell under that Act, and that she was fired in retaliation for taking FMLA leave. The District Court granted CCI's initial motion for summary judgment as to both claims. Thereafter, the District Court *sua sponte* reversed its ruling on Lupyan's FMLA interference claim. The court recognized that summary judgment was not appropriate because there was a factual dispute regarding whether CCI had informed Lupyan of her FMLA rights. Appx. I at 43-45. CCI responded with an amended summary judgment motion which included affidavits from CCI employees who testified that the Letter was properly mailed to Lupyan. Based on the affidavits, the District Court relied on the evidentiary presumption that arises under the "mailbox rule" and found that Lupyan had received the Letter. The Court entered summary judgment in favor of CCI, and this appeal followed.

## II. Discussion

We have jurisdiction to review a district court's final order under 28 U.S.C. §§ 1291 and 1331.

We exercise plenary review over a district court's order granting summary judgment. *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004). We apply the same standard as the district court. We affirm pursuant to Federal Rule 56(c) if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Id.* A factual dispute is material if it might affect the outcome of the suit under governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).

### A. The Family Medical Leave Act

Congress passed the FMLA in 1993 in an attempt "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). The FMLA enables "employees to take reasonable leave for medical reasons," *Id.* § 2601(b)(2). However, Congress recognized the needs of employers by requiring that all such leave be taken "in a manner that accommodates the legitimate interests of

4

employers," *Id.* § 2601(b)(3). The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for the employee's own "serious health condition that makes the employee unable to perform the functions" of his or her job. *See* 29 U.S.C. §2612(a)(1)(D). Following this period of leave, an employee has the right to be restored to his or her original position or its equivalent. *Id.* § 2614(a)(1). When an employee cannot perform an essential function of his or her original position due to the "continuation of a serious health condition," no right to restoration exists. 29 C.F.R. § 825.216(c).

The FMLA creates a cause of action for interference with the rights it bestows. Employees can sue for interference with the exercise of FMLA rights under 29 U.S.C. § 2615(a)(1). They can also sue under 29 U.S.C. §2615(a)(2), if an employer retaliates against an employee for exercising her FMLA rights. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.").

### 1.    Notice Requirements

The FMLA requires employers to provide employees with both general and individual notice about the FMLA. To meet the general notice requirements, an employer must post a notice of FMLA rights on its premises. *See* § 2619(a). Because employers have some discretion in the way FMLA policies are implemented,
employers must also include information regarding the employer's FMLA policies in a handbook or similar publication. *See* 29 CFR § 825.300.

In addition, regulations issued by the Department of Labor require that an employer give employees individual written notice that an absence falls under the FMLA, and is therefore governed by it. 29 CFR § 825.208; *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 142 (3d Cir. 2004) ("the regulations require employers to provide employees with individualized notice of their FMLA rights and obligations."). Thus, once an employer is on notice that

an employee is taking FMLA-qualifying leave, the employer must: (1) within five business days notify the employee of his or her eligibility to take FMLA leave, 29 C.F.R. § 825.300(b)(1); (2) notify the employee in writing whether the leave will be designated as FMLA leave, 29 C.F.R. § 825.300(d)(1); (3) provide written notice detailing the employee's obligations under the FMLA and explaining any consequences for failing to meet those obligations, § 825.300(c)(1); and (4) notify the employee of the specific amount of leave that will be counted against the employee's FMLA leave entitlement, § 825.300(d)(6).

## 2.     Interference Claims

The FMLA's requirement that employers inform employees of their rights under the Act is intended "to ensure that employers allow their employees to make informed decisions about leave." *Conoshenti*, 364 F.3d at 144 (citing *Nusbaum v. CB Richard Ellis, Inc.*, 171 F.Supp.2d 377, 379-80 (D.N.J. 2001)). Failure to provide the required notice can constitute an interference claim. *Id.* at 144-145.

However, an employer's failure to properly notify an employee of her FMLA rights does not necessarily prevent the employee from claiming that her leave is covered by the FMLA. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 82 (2002) (no relief under § 2615(a)(1) "unless the employee has been prejudiced by the violation"). Prejudice occurs when the employer's failure to advise the plaintiff of her FMLA rights "rendered h[er] unable to exercise [the right to leave] in a meaningful way, thereby causing injury." *Conoshenti*, 364 F.3d at 143; *see also Ragsdale*, 535 U.S. at 89.

Here, Lupyan claims that CCI interfered with her FMLA rights by not informing her that her leave was under the FMLA. According to her, she therefore was unaware of the requirement that she had to return to work within twelve weeks or be subject to termination. As noted above, the District Court ultimately entered summary judgment in CCI's favor on this issue based upon its conclusion that CCI provided adequate notice of Lupyan's FMLA rights via the Letter. The court also relied on provisions of CCI's

6

employee handbook which contains a description of an employee's rights under the FMLA.[1] However, the description in an employee handbook can only satisfy the FMLA's *general* notice requirements. *See* 29 CFR § 825.208. Even if we assume *arguendo* that Lupyan's receipt of a properly descriptive handbook provided the general notice under the Act, that would not resolve the issue before us. Given Lupyan's claim that she did not receive the Letter that CCI claims was properly mailed to her, we must decide whether the District Court properly afforded CCI the benefit of the presumption of receipt of properly mailed letters that arises under the "mailbox rule." It is clear that if CCI has established Lupyan's receipt of the Letter, CCI has shown that it satisfied the employer's obligation to provide actual notice under the FMLA.

## B. The Mailbox Rule

### 1. Presumption of Receipt

The presumption of receipt derives from the longstanding common law "mailbox rule." Under the mailbox rule, if a letter "properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time, and was received by the person to whom it was addressed." *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884); *Phila. Marine Trade Ass'n.-Int'l Longshoremen's Ass'n Pension Fund v. C.I.R.*, 523 F.3d 140, 147 (3d Cir. 2008).

However, this "is not a conclusive presumption of law." *Rosenthal*, 111 U.S. at 193-94 (citations omitted). Rather, it is a rebuttable "inference of fact founded on the probability that the officers of the government will do their duty and the usual course of business." *Id.* (noting that when the presumption of mailing is "opposed by evidence that the

---

[1] According to the record before the District Court, the handbook explains a CCI employee's rights with regard to FMLA leave. Lupyan's CCI employee file contains a "Receipt of Employee Handbook" form signed by Lupyan on June 21, 2004.

letters never were received," it must be weighed "by the jury in determining the question whether the letters were actually received or not.").

A "*strong* presumption" of receipt applies when notice is sent by certified mail, because it creates actual evidence of delivery in the form of a receipt. *Santana Gonzalez v. Att'y Gen.*, 506 F.3d 274, 279 (3d Cir. 2007) (emphasis added). A "weaker presumption" arises where delivery is sent via regular mail, for which no receipt, or other proof of delivery, is generated. *Id.* In the absence of actual proof of delivery, receipt can be proven circumstantially by introducing evidence of business practices or office customs pertaining to mail. *United States v. Hannigan*, 27 F.3d 890, 893 (3d Cir. 1994). This evidence may be in the form of a sworn statement. *Id.* at 895; *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 420 (5th Cir. 2007) ("a sworn statement is credible evidence of mailing for the purposes of the mailbox rule."). However, because the presumption is weak where proof of receipt is attempted solely by circumstantial evidence, we require the affiant to have "personal knowledge" of the procedures in place at the time of the mailing. *Kyhn v. Shinseki*, 716 F.3d 572, 574 (3d Cir. 2013).

As noted earlier, CCI amended its motion for summary judgment to take advantage of the mailbox rule and thereby establish that Lupyan had actual notice of her FMLA rights. CCI submitted the affidavits of Evan Gwynne, CCI's Mailroom Supervisor, and Anne Binns, CCI's Human Resources Coordinator, both of whom had personal knowledge of CCI's customary mailing practices when the Letter was allegedly mailed to Lupyan. Moreover, Binns swore that she personally prepared the Letter and placed it in the outgoing mail bin. App. Br. at 6.

However, CCI provided no corroborating evidence that Lupyan received the Letter. The Letter was not sent by registered or certified mail, nor did CCI request a return receipt or use any of the now common ways of assigning a tracking number to the Letter. Therefore, there is no direct evidence of either receipt or non-receipt. *See Estate of Wood v. Commissioner*, 909 F.2d 1155, 1161 (8th Cir. 1990) (noting that a postmark could present irrefutable evidence of

8

mailing). Instead, the only evidence CCI submitted consists of self-serving affidavits signed nearly four years after the alleged mailing date. *See* Affidavit of Anne Binns, Appx. III at 26-30. These affidavits implicate the presumption of receipt that arises under the mailbox rule. However, under the circumstances, it is a very weak presumption. Given Lupyan's denial, and the ease with which a letter can be certified, tracked, or proof of receipt obtained, that weak rebuttable presumption is not sufficient to establish receipt as a matter of law and thereby entitle CCI to summary judgment.

## 2.    *Rebutting the Presumption of Receipt*

Pursuant to the mailbox rule, once a party proves mailing, the presumption of receipt "imposes the burden of production on the party against whom it is directed[.]" *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 287 (3d Cir. 2006). Federal Rule Evidence 301 provides the default rule for how presumptions operate in federal civil cases. Specifically, the party the presumption operates against has the burden of producing evidence to rebut the presumption, while the actual burden of persuasion remains does not change. *McCann*, 458 F.3d at 287. Under this "bursting bubble" theory, the "'introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *McCann*, 458 F.3d at 287-88 (quoting *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 829-30 (3d Cir. 1994).

Moreover, the "quantum of evidence" needed to burst an evidentiary presumption's bubble in a civil case is "minimal." *McCann*, 458 F.3d at 288. "[T]he presumption's only effect is to require the party [contesting it] to produce enough evidence substantiating [the presumed fact's absence] to withstand a motion for summary judgment or judgment as a matter of law on the issue." *Id.* Accordingly, a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. *See, e.g., Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d

Cir. 2009). This remains true even if the affidavit is "self-serving."[2] *Id.*

Accordingly, under Rule 301, Lupyan's contention that she had no notice that her leave was subject to the limitations of the FMLA because she never received CCI's Letter, sufficiently burst the mailbox rule's presumption, to require a jury to determine the credibility of her testimony, as well as that of CCI's witnesses. The District Court therefore erred in rejecting Lupyan's affidavit as a matter of law based on her inability to corroborate her claim that she never received the Letter from CCI. Appx. I at 4.

Lupyan argues that her testimony alone, if credited by the factfinder, should be sufficient to rebut the presumption she received the Letter. We recently adopted this position in a suit under the Truth in Lending Act ("TILA"). *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011). There, the District Court instructed the jury that "[i]n a TILA case, something more than just the testimony of the borrower is needed to rebut the presumption that she received two copies of the Notice" of her right to rescind her mortgage. *Cappuccio*, 649 F.3d at 189. We reversed. We held that "the testimony of a borrower alone," that she did not receive the requisite notice, was "sufficient to overcome TILA's presumption of receipt." *Id.* at 190. We reasoned that the plaintiff's testimony related directly to a material issue in her TILA claim, and was based on her personal knowledge. *Id.* Accordingly, her testimony overcame the presumption, leaving to the jury "the decision of whether to credit her testimony, or that of [defendant's] witnesses[,]" who testified that the requisite notices were sent. *Cappuccio*, 649 F.3d at 190; *Kirleis*, 560 F.3d at 161-63.

---

[2] As with any other kind of evidence, the declarant's interest in the outcome is merely one factor for the ultimate finder of fact to weigh in determining the reliability of the evidence. It is not a reason to automatically reject the evidence. Indeed, the testimony of a litigant will almost always be self serving since few litigants will knowingly volunteer statements that are prejudicial to their case. However that has never meant that a litigant's evidence must be categorically rejected by the fact finder.

There is no meaningful distinction between the circumstances in *Cappuccio*, and the circumstances here. *Cappuccio* applied the widely-accepted interpretation of Rule 301 that "'the introduction of evidence to rebut a presumption destroys the presumption . . . .'" *Id.* at 189 (quoting *McCann*, 458 F.3d at 287-88). Although we recognized that Congress could impose a more stringent burden to rebut a presumption under Rule 301, our holding was not based on anything in the TILA. *Id.* at 190. Similarly, there is no language in the FMLA or its regulations that suggests a legislative intent to create a stronger presumption there than would otherwise apply in under Rule 301. Accordingly, we hold that evidence sufficient to nullify the presumption of receipt under the mailbox rule may consist solely of the addressee's positive denial of receipt, creating an issue of fact for the jury.

We recognize that, at the summary judgment stage, the mailbox rule can be an efficient tool "for determining, in the face of inconclusive evidence, whether or not receipt has actually been accomplished." *Schikore v. Bank America Supplemental Retirement Plan*, 269 F.3d 956, 961 (9th Cir. 2001); *see also Phila. Marine Trade*, 523 F.3d at 147. However, the mailbox rule has never been an "immutable legal command." *Laborers' International,* 594 F.3d 732, 738 (10th Cir. 2010). Rather, it is simply an evidentiary presumption, based on the historic efficiency of the United States Postal Service, that letters will be timely delivered to the addressee when properly mailed. *See Rosenthal,* 111 U.S. at 193. However, there has never been a claim that the postal service has obtained perfection or that it is infallible. Indeed, this case highlights an inherent flaw in this long-standing presumption: that the risk of non-delivery falls squarely on the shoulders of the intended recipient. Where, as here, receipt of a letter is a contested issue, the individual recipient is forced to prove a negative. The law has long recognized that such an evidentiary feat is next to impossible. *See Piedmont and Arlington Life-Ins. Co. v. Ewing*, 92 U.S. 377, 380 (1875) ("While it may be easy enough to prove the affirmative of [a] question[], it is next to impossible to prove the negative").

11

When the intended recipient is a commercial or legal entity, it may be routine business practice to log incoming mail. In such cases, the absence of an entry in a mail log near the time that mail would likely have arrived, can be used to establish that mail was not received. *See United States v. Dawson*, 608 F.2d 1038, 1040 (5th Cir. 1979) (where evidence demonstrates that mail is logged in immediately upon receipt from the mail carrier, non-logging can "be equated with nonreceipt"). However, one cannot reasonably expect individuals to maintain logs of incoming mail. Moreover, even if an enterprising (or particularly compulsive) individual did maintain a mail log, it would not qualify as a "business record" under the Federal Rules of Evidence, and the absence of an entry showing receipt would therefore not be admissible to show a letter was not received. 30C Michael H. Graham, Fed. Prac. & Proc. Evid. § 7047 (2014 ed.) ("Papers kept by an individual solely for personal reasons do not qualify as business records for the purposes of Rule 803(6)[.]").

Accordingly, individuals in Lupyan's position have no way of establishing that they did not receive a disputed letter, other than to "prove a negative." Where ordinary mail is used, requiring more than a sworn statement to dispute receipt elevates the weak presumption intended by the mail box rule to a conclusive presumption that would be equivalent to an ironclad rule.

In this age of computerized communications and handheld devices, it is certainly not expecting too much to require businesses that wish to avoid a material dispute about the receipt of a letter to use some form of mailing that includes verifiable receipt when mailing something as important as a legally mandated notice. The negligible cost and inconvenience of doing so is dwarfed by the practical consequences and potential unfairness of simply relying on business practices in the sender's mailroom. This is particularly evident here, because CCI's employees had to recall the circumstances surrounding a letter that was mailed four years earlier. Where, as here, denial of receipt creates a genuine issue of material fact, justice should not give way to expediency or the rigid application of a common law

12

presumption that was adopted long before modern forms of communication and proof could have even been imagined.

We therefore conclude that Lupyan's denial of receipt of the Letter is enough to create a genuine issue of material fact that must be resolved by a factfinder. This is particularly true when we consider the record in the light most favorable to Lupyan, as we must on summary judgment review. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (noting that credibility determinations are inappropriate at summary judgment). [3] Accordingly, we reverse the District Court's order granting summary judgment on Lupyan's FMLA interference claim, and remand for determination of whether she received notice that her leave fell under the FMLA.[4]

---

[3] Moreover, in addition to her sworn denial of receipt, Lupyan—who has since had opportunity to review a copy of the Letter—notes that the Letter provides as follows: "You notified us that you need to leave beginning 12/4/07 and that you expect this leave to continue through October 3/31/2008." Appx. III at 37. As noted above, Lupyan's revised Request for Leave Form states her return date as April 1, 2008. A jury can consider what, if any, ramifications this discrepancy has in resolving issues of credibility.

Lupyan also points to an unsigned Acknowledgment of Receipt in her personnel file, which was enclosed with the Letter. While there is no requirement under FMLA that an employer obtain a signed Acknowledgment of Receipt from an employee to prove that the employee actually received their FMLA Notice of Rights, the fact that there is an *unsigned* Acknowledgment of Receipt in her personnel file could cause a factfinder to conclude that Lupyan either failed to sign and return the Acknowledgment, or that she never received the Letter in the first place.

[4] Of course, as the plaintiff, Lupyan still bears the underlying burden of persuasion. Thus, on remand, Lupyan must prove by a preponderance of the evidence that she did not have notice that she was on FMLA leave.

13

## C. Prejudice to Lupyan

Our inquiry into Lupyan's interference claim does not end with our conclusion that there are factual issues surrounding receipt of the Letter that must be resolved. Even if CCI failed to provide timely personal notice of FMLA rights, Lupyan must still establish that she was prejudiced by the lack of notice. *Ragsdale,* 535 U.S. at 89 (noting that "FMLA's comprehensive remedial mechanism" affords no relief absent prejudice from a statutory violation). This requires her to demonstrate that, had she been properly informed of her FMLA rights, she could have structured her leave differently. *Conoshenti*, 364 F.3d at 145-146; *see also Capilli v. Whitesell Constr. Co.*, 271 Fed. Appx. 261, 267 (3d Cir. 2008).

It is undisputed that Lupyan received all of the leave she was entitled to under the FMLA.[5] Indeed, Lupyan did not provide a release to return to work without restrictions until April 9, 2008, approximately *eighteen* weeks after she began her leave. However, Lupyan contends that, had she known her leave fell under the FMLA, she would have expedited her return and rejoined CCI before she exhausted her twelve weeks of leave and was effectively terminated. Appx. II at 37-38. If accepted by a jury, that would be sufficient to establish the required prejudice under the FMLA. *Conoshenti*, 364 F.3d at 142–143 (plaintiff could demonstrate prejudice by showing that, had he received notice of his rights under the FMLA, "he would have been able to make an informed decision about structuring his leave and would have structured it, and his plan of recovery, in such a way as to preserve the job protection afforded by the Act"). *See also Nussbaum v. C.B. Richard Ellis*, 171 F. Supp. 2d 377, 385-86 (D.N.J. 2001) (noting that "the overall intent of the FMLA is lost when an employer fails to provide an employee with the

---

[5] According to the record Lupyan's FMLA leave began on or about December 4, 2007, and officially expired twelve weeks later, on or about February 26, 2008. Lupyan first informed CCI of her release to return to work on March 13, 2008, approximately fourteen weeks after she initiated her leave.

opportunity to make informed decisions about her leave options and limitations").

Moreover, while corroborating evidence is not necessary, Lupyan points to her first doctor's release, dated March 13, 2008, issued only two weeks after her FMLA leave expired. The release does not indicate Lupyan was actually *unable* to return to her job at CCI; instead, it states that she "would benefit from a position with minimal student contact if at all possible." App. Br. at 5. Thus, while Lupyan's Request for Leave Form contains a projected return date of April 1, 2008, the record does not establish that she was not able to return to her job before February 26, 2008, when her FMLA leave expired.

The credibility of Lupyan's statements, that she could have returned to work within twelve weeks had she known her job was in jeopardy, must also be weighed by the factfinder. *See Anderson*, 477 U.S. at 255 (noting that credibility determinations should not to be made at summary judgment).

## D. Retaliation

Lupyan also alleges that she was terminated in retaliation for taking FMLA leave, in violation of the Act. Lupyan did not submit direct evidence of discriminatory behavior, and the District Court appropriately analyzed her claim under the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (applying *McDonnell Douglas* to FMLA interference claims based on circumstantial evidence). Under that framework, a plaintiff challenging an adverse employment decision has the initial burden of establishing a prima facie case.[6] *See McDonnell*

---

[6] To establish a prima facie case for retaliation under the FMLA, Lupyan was required to show that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein* , 691 F.3d at 302.

15

*Douglas*, 411 U.S. at 802. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the decision. *Id.* Once that burden is met, the plaintiff must establish by a preponderance of the evidence that the articulated reason was a pretext for discrimination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). In the summary judgment context, this means that once the employer articulates a legitimate, non-discriminatory reason, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perksie*, 32 F.3d 759, 763 (3d Cir. 1994).

Here, CCI asserted two reasons for terminating Lupyan's employment: (1) she exhausted her FMLA leave; and (2) low student enrollment meant that her position was no longer needed. Appx. II at 8. As to the first reason, we agree that Lupyan's employment legally ended upon expiration of her FMLA leave. *See Ragsdale,* 535 U.S. at 85.[7] However, Lupyan's return outside of the twelve week window does not preclude her retaliation claim under the circumstances here. "The FMLA's protection against retaliation is not limited to periods in which an employee is on FMLA leave, but encompasses the employer's conduct both during and after the employer's FMLA leave." *Hunt v. Rapides Healthcare System, LLC.*, 277 F.3d 757, 768-69 (5th Cir. 2001). The nature of retaliation claims distinctly focuses on the employer's conduct and motivations for termination. Therefore, an employee is not precluded —as a matter of law —from bringing a retaliation claim simply because she exceeded the twelve-week FMLA entitlement. *See Lichtenstein*, 691 F.3d at 302 (noting that FMLA retaliation claims require proof of the employer's retaliatory intent).

---

[7]    Moreover, it is in disputable that the first reason is causally related to Lupyan's invocation of her FMLA rights: she could not have been "effectively terminated" from her position at CCI upon expiration of her designated FMLA leave, had she not taken FMLA leave in the first place.

Thus, we must scrutinize CCI's second proffered reason for Lupyan's termination.

The District Court concluded that, even assuming Lupyan could establish a *prima facie* case of retaliation, she "failed to direct [the court] to any evidence from which a factfinder could reasonably either: (1) disbelieve CCI's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of her termination." *Lupyan v. Corinthian Colleges, Inc.*, No. 2:09cv1403, 2011 WL 4017960 at *8 (W. D. Pa. Sept. 8, 2011). The District Court's conclusion is inconsistent with the record.

After submitting her full release, Lupyan was advised that she was terminated not only because she failed to return within twelve weeks, but also because of low student numbers. CCI alleges that enrollment had declined in the twelve-month period before Lupyan's return, and classes had been eliminated to such an extent that Lupyan's position as an instructor was no longer needed. Appx. III at 7-8. However, CCI's own witness testified that, as a matter of school policy, CCI does not "lay off" instructors because of downturns in enrollment. Appx. II at 8-9; Appx. III at 10. Thus, even if a downturn in enrollment had occurred, it was highly unusual for CCI to respond by terminating Lupyan's position. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (noting that one means of establishing the requisite causal connection in retaliation claims is setting forth evidence showing "inconsistent reasons for terminating the employee"). Given the unusual nature of her termination and its proximity to Lupyan's leave, a jury could reasonably conclude that Lupyan's request for FMLA leave motivated this differential treatment.

Furthermore, despite acknowledging that Lupyan was a current employee and not a new hire, one of CCI's witnesses testified that Lupyan was terminated pursuant to a "hiring freeze" necessitated by a downturn in enrollment. Appx. III at 7-8. However, another of CCI's witnesses testified that Lupyan would not have been considered a new hire. Rather, she would have been considered "an employee on leave that was being brought back." Appx. III at 40.

17

Indeed, if Lupyan was considered an employee at the time she attempted to return to work, it follows that she may not have been subject to a "hiring freeze" because she was not being "hired" to fill her position. Moreover, despite the alleged school-wide hiring freeze, CCI hired a new instructor (albeit in a different department) less than a month after the freeze purportedly went into effect. Appx. II at 14.

Finally, only *eight days* before Lupyan was informed of both the "hiring freeze" and the year-long downturn in enrollment, Thomas told her that she could return to her position as long as she provided an unrestricted release verifying that she could work without accommodations. Appx. I at 27.

Based on all of the above, we believe that a reasonable jury could discredit CCI's reasons for Lupyan's termination as pretextual. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (noting that, where "the timing of the alleged retaliatory action [is] unusually suggestive of retaliatory motive," a "causal link will be inferred.") (internal quotation marks omitted). The District Court's contrary conclusion appears based on the court's failure to consider the "record as a whole" in a manner favorable to Lupyan. *Farrell*, 206 F.3d at 281. Accordingly, we will also reverse the District Court's order granting summary judgment on Lupyan's FMLA retaliation claim.

## V. Conclusion

For the foregoing reasons, we will vacate the District Court's grant of summary judgment to CCI on both the retaliation and interference claims and remand to the District Court for proceedings consistent with this opinion.